UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:20-cv-81501-Matthewman

HEALTHCARE RESOURCES MANAGEMENT
GROUP, LLC,

       Plaintiff,

v.

ECONATURA ALL HEALTHY WORLD, LLC, et al.,

       Defendants.

_____/

FILED BY _____KJZ_____ D.C.

Oct 27, 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## OMNIBUS ORDER ON DEFENDANTS' VARIOUS MOTIONS FOR SUMMARY JUDGMENT [DE 85; 90; 143; 149]

THIS CAUSE is before the Court upon Defendants' various Motions for Summary Judgment.[1] Specifically, Rejuvenol Laboratories, Inc.'s ("Rejuvenol") Motion for Summary Judgment [DE 85]; NoXeno Health Sciences, Inc.'s ("NoXeno") Motion for Summary Judgment [DE 90]; Medterra CBD, LLC's ("Medterra") Motion for Summary Judgment [DE 143][2]; and EcoNatura All Healthy World, LLC's ("EcoNatura") Motion for Summary Judgment [DE 149].[3]

---

[1] For clarity, "Defendants" refers to all of the Defendants collectively. "Joint Defendants" refers to all of the Defendants with the exception of NoXeno, who filed its own Statement of Undisputed Material Facts in this case.

[2] A redacted version of Medterra's Motion for Summary Judgment is at docket entry 143. Medterra's Motion for Summary Judgment at docket entry 145 is unredacted and filed under seal.

[3] A redacted version of EcoNatura's Motion for Summary Judgment is at docket entry 149. EcoNatura's Motion for Summary Judgment at docket entry 152 is unredacted and filed under seal.

Joint Defendants filed a Joint Statement of Undisputed Material Facts and evidence to support their motions. [DE 144 ("JSUF")].[4]  NoXeno filed its own Statement of Undisputed Material Facts and evidence to support its motion [DE 91 ("NoXeno SMF")].

Plaintiff filed an Omnibus Response in Opposition to Joint Defendants' Motions for Summary Judgment [DE 175] and filed its Response to the Joint Statement of Undisputed Material Facts [DE 174 ("Pl's SMF")]. Plaintiff did not respond to NoXeno's Statement of Undisputed Material Facts.

Defendants each replied to their own respective motion [DE 132; 176; 194; 195], and Defendants collectively filed a Joint Reply Statement of Material Facts [DE 193].

The Court held a hearing on the motions via Zoom video teleconference on October 6, 2021. The matters are now ripe for review.  The Court has carefully considered the complaint [DE 1], the parties' written submissions, the parties' oral argument at the hearing, the record, and applicable law.

## I.    SUMMARY OF THE CASE AND OVERVIEW OF THE COMPLAINT

This is a trade secrets lawsuit involving a topical cannabidiol ("CBD") (a chemical derived from hemp) pain cream (hereinafter, the subject cream is referred to as the "CBD-based Pain Cream"). Plaintiff filed its four-count complaint on September 3, 2020, alleging misappropriation of trade secrets pursuant to the Florida Uniform Trade Secrets Act, Florida Statutes § 688.001 *et seq.* ("FUTSA") (Count I); misappropriation of trade secrets pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ("DTSA") (Count II); violations of the Florida Deceptive and Unfair

---

[4] A redacted version of Joint Defendants' Joint Statement of Undisputed Material Facts is at docket entry 144. Joint Defendants' Joint Statement of Undisputed Material Facts at docket entry 146 is unredacted and filed under seal.

Trade Practices Act, Florida Statutes § 501.201 *et seq.* ("FDUPTA") (Count III); and tortious interference with a business relationship (Count IV). [DE 1 ("Compl.")]. Specifically, as to each Defendant, the complaint alleges Counts I and II against Rejuvenol; Counts I, II, and II against NoXeno and Medterra; and Counts I, II, III, and IV against EcoNatura. *Id.*

This is actually the second lawsuit brought by Plaintiff against Defendants based on the same set of facts. *See Healthcare Resources Management Group, LLC v. EcoNatura All Healthy World, LLC et al*, Case No. 19-cv-81700-DMM. There, Plaintiff filed its complaint on December 20, 2019. *Id.* at DE 1. On April 24, 2020, Plaintiff's counsel moved to withdraw as counsel of record due to irreconcilable differences. *Id.* at DE 44. The Court granted the motion, and instructed that because Plaintiff is an artificial entity, it must be represented by counsel and is unable to proceed *pro se. Id.* at DE 45. When Plaintiff failed to timely obtain replacement counsel, the Court dismissed its case without prejudice on May 21, 2020. *Id.* at DE 56. In so doing, the Court found that the record demonstrated that Plaintiff had been far from diligent in litigating this matter, and Plaintiff failed to establish that Plaintiff diligently attempted to obtain replacement counsel. *Id.* Three months later, Plaintiff filed the instant complaint on September 3, 2020.

To provide context, the Court finds it necessary to provide a summary of the basic facts in the complaint. Plaintiff is a producer of pharmaceutical-grade hemp products. Compl. ¶ 8. Plaintiff sells its products under both its "Pharmalieve" brand and on a "white label" basis. *Id.* Selling products on a "white label" basis means that Plaintiff sells its product without its branding to a third-party and the third-party puts its logo on the product and sells the product. *Id.* ¶¶ 8, 22, 33, 34.

In 2017, Plaintiff was introduced to EcoNatura, who manufactures creams and lotions. *Id.* ¶¶ 12-13. EcoNatura manufactures its products through a laboratory and production facility which is owned and operated by Rejuvenol. *Id.* ¶14.

Upon meeting, Jama Russano (an owner of EcoNatura) and Sam Genovese (an owner of Plaintiff) discussed forming a joint venture which would produce and distribute CBD-based products. *Id.* ¶15. The joint venture envisioned a merger between EcoNatura and FoxFire Edibles, LLC ("FoxFire"), which was another company owned by Genovese, and others in the CBD industry. *Id.*

Sometime in 2018, Plaintiff and EcoNatura began reformulating and manufacturing a CBD-based Pain Cream. *Id.* ¶ 17. This CBD-based Pain Cream was to be produced by EcoNatura and manufactured by Rejuvenol. *Id.* ¶ 19.

Shortly after Plaintiff and EcoNatura began producing their CBD-based Pain Cream, Medterra (an existing client of Plaintiff) sought to purchase the CBD-based Pain Cream on a "white label" basis so that Medterra could market and sell the CBD-based Pain Cream under Medterra's branding. *Id.* ¶¶ 21-22. In March 2018, Plaintiff agreed to produce CBD-based Pain Cream for Medterra. *Id.* The arraignment worked like this: Medterra submitted purchase orders to Plaintiff for the CBD-based Pain Cream. *Id.* ¶ 23. Plaintiff would forward those purchase orders to EcoNatura. *Id.* ¶ 23. EcoNatura would contact Rejuvenol, who then produced, packaged, labeled, and distributed the product to Medterra. *Id.* Medterra branded and sold the product at retail. *Id.* ¶¶ 22-23. As for payment, Plaintiff would bill Meterra, and Medterra would pay Plaintiff directly, who in turn paid EcoNatura and Rejuvenol. *Id.* ¶¶ 22, 54.

Ultimately, certain problems ended the business relationship between Plaintiff and EcoNatura, prompting Plaintiff to secure a new manufacturer and distributor. *Id.* ¶¶ 48, 50, 52. After the relationship between Plaintiff and EcoNatura deteriorated, Plaintiff assumed that Medterra would continue purchasing products from Plaintiff. *Id.* ¶¶ 50, 51, 52, 55. However, Medterra discontinued ordering from Plaintiff. *Id.* ¶ 55. Thereafter, Medterra purchased the CBD-based Pain Cream from EcoNatura which was manufactured by Rejuvenol. *Id.* ¶ 56.

## II.   REQUIREMENTS FOR PLEADING AND RESPONDING TO A MOTION FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 and Local Rule 56.1 mandate the procedure for pleading and responding to a Motion for Summary Judgment. Rule 56(c)(1) states:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "Our Local Rule requires even greater specificity." *Silverstein v. Boehringer Ingelheim Pharm., Inc.*, 19-CIV-81188, 2020 WL 6110909, at *4 (S.D. Fla. Oct. 7, 2020). Each asserted or disputed fact must be "supported by specific, pinpoint references" to particular parts of the record. S.D. Fla. L.R. 56.1(b)(1)(B), (b)(2)(A). "The pinpoint citations shall reference pages and line numbers, if appropriate, of exhibits, designate the number and title of each exhibit, and provide the ECF number of all previously filed materials used to support the

Statement of Material Facts. When a material fact requires specific evidentiary support, a general citation to an exhibit without a page number or pincite (e.g., 'Smith Affidavit' or 'Jones Deposition' or 'Exhibit A') is non-compliant." S.D. Fla. L.R. 56(b)(1)(B). The Court has discretion to disregard a factual assertion or dispute that is not properly supported. Fed. R. Civ. P. 56(e); S.D. Fla. L.R. 56.1(c), (d). The Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

At the outset of this Order, the Court finds it necessary to comment on some of the many deficiencies in Plaintiff's Response to the Joint Defendants' Joint Statement of Undisputed Material Facts. The Court will address how these deficiencies impact its ruling on summary judgment in the analysis *infra*.

Plaintiff inserted a footnote in its "Additional Facts" section heading. The footnote states, "All of the individual Statements contained within the 'Statement Of Additional Facts In Opposition To Defendants' Motions For Summary Judgment' are verified and affirmed within the Declaration of Sam Genovese and/or are supported to citations to record evidence referenced in each paragraph herein." [Pl's SMF at 25]. Plaintiff then provides its additional facts from paragraphs 96 to 164. Out of Plaintiff's 68 additional facts, only 9 paragraphs include a citation to any record evidence.[5] In addition, Plaintiff does not actually provide a citation to Genovese's declaration anywhere within this filing.

---

[5] The Court is being generous here by including in those 9 *any* citation to record evidence, even if the citation is deficient under our Local Rules, including failing to provide a page number or pincite. *See, e.g.*, Pl's SMF ¶ 127 (citing as follows: "*See* Declaration of Genovese.").

6

Plaintiff was similarly quite deficient when responding to the Joint Defendants' Joint Statement of Undisputed Material Facts.[6] For instance, paragraph 62 is disputed by Plaintiff with no explanation and no citation to record evidence—it just says "Disputed." Paragraphs 63 and 64 are also disputed by Plaintiff, stating "Disputed for the same reasons that Defendants Joint Statement No. 62 is disputed." And again, Plaintiff makes no citation to record evidence in paragraphs 63 or 64.  As a result, Plaintiff's responses to paragraphs 62, 63, and 64 are entirely deficient to dispute these facts.  Similarly, paragraph 65 is disputed without citing to any record evidence, and paragraph 66 is "Disputed for the same reasons that Defendants Joint Statement No. 65 is disputed." Again, as a result, Plaintiff's responses to paragraphs 65 and 66 are entirely deficient to dispute these facts.

Moreover, Plaintiff's "method" of citation by pointing the Court to other paragraphs within Plaintiff's filing was excessive, improper, and put the Court on a wild goose chase in an attempt to piece together Plaintiff's position in opposing summary judgment against it.  Paragraph 32 is disputed by Plaintiff "for the same reason that Statement # 17 is disputed." So the Court looks to paragraph 17. Paragraph 17 is disputed, *inter alia,* "for the same reasons that Statement # 13 and #15 are disputed." So the Court looks to paragraph 15, which is disputed, *inter alia,* "for the same reasons that Statement # 13 is disputed."  So the Court looks to paragraph 13, which is disputed, and points the Court to, *inter alia,* paragraphs 143-146 of Plaintiff's statement of additional facts. So the Court looks to paragraphs 143-146 of Plaintiff's statement of additional facts, all of which have no citation to record evidence. And this dead-end method of citation by reference occurs throughout Plaintiff's filing.  For another example, paragraph 76 is disputed by Plaintiff, and

---

[6] The Court will address Plaintiff's total failure to respond at all to NoXeno's Statement of Undisputed Material Facts *infra*.

Plaintiff cites to paragraphs 159-161 of its own additional facts.  So the Court looks to paragraph 159-161 of Plaintiff's additional facts—none of which includes a citation to evidence.

When Plaintiff did include a citation to its exhibits, it cited to the document's Bates number, which is improper under the Local Rules and wholly unhelpful to the Court. For example, paragraph 40 is disputed by Plaintiff.  It says, "Disputed. Russano was aware that we were looking for other factories to provide lower costs of manufacturing. *See* HRMG-00544-546."[7] Pointing the Court to "HRMG-00544-546" is not in compliance with our Local Rules and the Court's CM/ECF procedures, Rule 3L (2), which provides that the filer "descriptively name each attachment (e.g., Exhibit 1 - Affidavit of Boo Radley) in a manner that enables the Court to easily locate and distinguish attachments."  An exhibit titled with a Bates number does not allow the Court to easily locate and distinguish its attachments. This labeling also posed a problem during oral argument, taking a significant amount of time for the Court, and Plaintiff's counsel, to figure out which Bates number corresponds with which of Plaintiff's 37 exhibits, and which of these poorly identified exhibits allegedly refute the Defendants' arguments for summary judgment in their favor.

These are just a few examples of Plaintiff's incredibly deficient briefing in summary judgment.  The Court need not waste additional resources in describing the totality of Plaintiff's deficiencies in summary judgment and will address specific deficiencies *infra* as it relates to the Court's analysis in ruling on the Defendants' requests for summary judgment in their respective favor.

---

[7] To be clear, paragraph 40 also includes several other statements, all of which are without citation to record evidence.

### III. SUMMARY JUDGMENT STANDARD

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts, and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As Rule 56 explains, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact ... the court may ... grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Therefore, the nonmoving party "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial." *Walker v. Darby*, 911 F.2d 1573, 1576–77 (11th Cir. 1990). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016) (internal quotations omitted).

In deciding a summary-judgment motion, the Court must view the facts in the light most favorable to the nonmoving party. *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). The

Court also must resolve all ambiguities and draw all justifiable inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## IV.   STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE[8]

Anselmo (Sam) Genovese ("Genovese") and Mercy Romero ("Romero") are the owners of Plaintiff, Healthcare Resources Management Group, LLC, which they created in 2009.  [DE 174, DE 144 ("Pl's SMF & JSUF") ¶¶ 9, 96].  From 2009 through the present, Genovese has been active in the healthcare and pharmacology industry. *Id.* ¶ 101.

Plaintiff took steps to in 2016 and 2017 to create a viable CBD product.  *Id.* ¶ 118. In 2017, Plaintiff formulated and manufactured its first batch of CBD topical pain cream, or "cooling" cream using its alleged trade secret. *Id.* ¶¶ 104, 105, 118, 121.  Thereafter, Plaintiff had relationships with pharmaceutical manufactures, subject to confidentiality and non-disclosure agreements, to manufacture products using the alleged trade secret. *Id.* ¶ 122.

In addition to selling products directly under Plaintiff's label called "Pharmalieve," Plaintiff also sold products containing the alleged trade secret to other companies that would, in turn, use their own branding to sell on the retail market. *Id.* ¶ 123. Medterra is a retailer, and the

---

[8] The following facts are drawn from the uncontested portions of the record together with the parties' statements of material facts and supporting evidence, and these facts are viewed in the light most favorable to the non-moving party, Plaintiff. To the extent a party has acknowledged that the opposing party's fact is "undisputed," the fact will be treated as undisputed for purposes of the pending motions. Where the response states that the fact is undisputed but not material, the Court has conducted a separate materiality assessment. Each party asserts that some of the opposing party's proposed facts are not properly supported by the evidence cited; therefore, to the extent a party fails to cite record evidence in support of an alleged fact, that alleged fact will not be considered proven. To the extent the parties' statement of material facts contain argument and characterizations of the facts, the Court has extracted the underlying facts from the record and ignored said characterizations. To the extent a fact is labeled "disputed" but is clearly undisputed by the record evidence, the Court will consider the fact to be undisputed.

business relationship between Plaintiff and Medterra began in April 2017. *Id.* ¶ 87; DE 144-4 ("J.P. Larsen Decl.") ¶¶ 3, 9, 21.

In April 2017, Plaintiff and Pharmacanna Worldwide (a non-party to this lawsuit) entered into an agreement to produce CBD creams containing Plaintiff's alleged trade secret.  [Pl's SMF & JSUF ¶ 124]. Medterra is not a party to the Contractor Agreement, and its name is not mentioned anywhere in the agreement. *Id.*  The agreement includes Kristen Adelmann individually as a party in the first paragraph of the agreement. *Id.*  The agreement is signed by Jeff Moore on behalf of Pharmacanna and by Genovese on behalf of Plaintiff. [Pl's Ex. 23]. Adelmann used the email address kristen@medterracbd.com in 2017 while assisting Medterra to sell its CBD inventory. *Id.* ¶ 124.

Jama Russano is the owner and Chief Executive Officer of EcoNatura. *Id.* ¶ 1. Russano is also a former member and partner of NoXeno. [DE 91 ("NoXeno SMF")[9] ¶ 1; *see* Compl. ¶ 15; DE 144-2 ("J. Russano Aff.") ¶ 4]. Other members of NoXeno included Warren Wise.  *Id.*  Russano is experienced in the cosmetic and skincare product and health and beauty industries. [Pl's SMF & JSUF ¶ 2].

Russano developed a product line for EcoNatura called "Ruby Blue Bunny," which she formulated and developed in 2014, and EcoNatura has sold on the market since that time. *Id.* ¶ 3. In 2017, Rejuvenol began manufacturing products for EcoNatura, including its Ruby Blue Bunny

---

[9] Due to some overlap in the Joint Defendants' Joint Statement of Undisputed Material Facts and NoXeno's Statement of Undisputed Material Facts, and in the interest of justice, the Court will not adopt all of NoXeno's submitted material facts based on Plaintiff's failure to respond to them. Instead, to the extent NoXeno's material facts materially differ from the Joint Defendants' material facts, Plaintiff has admitted to these facts in failing to respond to them, pursuant to Local Rule 56.1(c).

line. *Id.* ¶ 5. Also in 2017, Russano, with the help of Rejuvenol, developed multiple sample CBD-based products, including a healing cream and body lotion.  [JSUF ¶ 8; Russano Aff. ¶ 48]. EcoNatura provided these sample products to potential clients to market potential business relationships with them. *Id.*

By June of 2017, Russano had begun exploring the possibility of creating a joint venture that would work toward the NoXeno concept of a "seed to sale" operation of a CBD product development, manufacture, and sale business ("the NoXeno Joint Venture").  [NoXeno SMF ¶ 9; J. Russano Aff. ¶¶ 46, 50; DE 144-1 "Genovese Dep. Tr.") 203:5-12].  As part of this, she engaged in some initial discussions with a group operating in the CBD business at the time under the name Full Impact, LLC, led by Jeff Moore and Jamie Goldstein (originally this group used the name "Pharmacanna Worldwide"). [NoXeno SMF ¶ 9; J. Russano Aff. ¶ 50].

By the summer of 2017, Russano and Wise had formed NoXeno, a company with the goal of growing specific strains of CBD and formulating them in all levels of CBD consumer products, including for private label brands, with the concept that the products would be made without the use of harsh chemicals or pesticides. [NoXeno SMF ¶ 6; J. Russano Aff. ¶¶ 46, 47, 50].

By August of 2017, Moore and Goldstein introduced Russano to Genovese. [NoXeno SMF ¶ 10; J. Russano Aff. ¶ 51; Pl's SMF & JSUF ¶¶ 10, 11, 138]. Genovese was introduced to Russano as a pharmacist with experience and contacts in the CBD, industrial hemp, and THC industry. [NoXeno SMF ¶ 10; J. Russano Aff. ¶ 51; *see also* Genovese Dep. Tr. 194:21-195:10, 196:7-11].

By the fall of 2017, Russano began engaging in discussions with Genovese about the development of certain CBD-based products, which included CBD-based gelcaps, tinctures and

skin creams, as well as a line of pet-related products. [NoXeno SMF ¶ 11; J. Russano Aff. ¶¶ 52-53; Genovese Dep. Tr. 196:7-197:9]. The thinking at the time was that these products would all eventually be included as part of the possible NoXeno Joint Venture. *Id.*  As part of this, in late fall of 2017, Genovese introduced Russano to his business associates in a CBD candy and pet product company called FoxFire Edibles, owned by Jeff Fox and Robert Pinchuk. [NoXeno SMF ¶ 12; J. Russano Aff. ¶ 53; Genovese Dep. Tr. 83:1-85:20].

In January 2018, Russano, Genovese, Romero, and Fox, met at the Rejuvenol manufacturing facility in New York to explore further business opportunities with respect to CBD products.  [Pl's SMF & JSUF ¶ 11].  At this meeting, Russano gave Genovese and Romero samples of EcoNatura's Ruby Blue Bunny and other cream products.  *Id.*; *see also* Genovese Dep. Tr. 201:24-202:6. Thereafter, Genovese told Russano that he had a potential customer (Medterra, not disclosed by name), that wanted a high-end product, and that Genovese wanted Russano to formulate a new product that was "better" than the product that was previously sold under his "Pharmalieve" brand and provided to another customer named Pharmacanna. [JSUF ¶ 12; J. Russano Aff. ¶¶ 58, 62; *see also* Pl's SMF ¶ 12; Genovese Dep. Tr. 212:9-18]. Once created, this product would become the CBD-based Pain Cream at issue in this lawsuit. Also during the New York meeting, the parties discussed the prospect of the NoXeno Joint Venture and the concept of a "seed to sale" operation in the CBD market. [NoXeno SMF ¶ 14; Genovese Dep. Tr. 202:22-203:12]. In sum, there were two ultimate purposes to this meeting: discussing the possible NoXeno Joint Venture project, and Plaintiff and EcoNatura's discussion of developing a product (ultimately the CBD-based Pain Cream) based on a potential buyer (Medterra).

13

Soon after meeting in New York, EcoNatura, NoXeno, Genovese, Pinchuk, and Fox agreed to move forward together in an attempt to bring the NoXeno joint venture to reality. [Noxeno SMF ¶ 15; J. Russano Aff. ¶ 55; Genovese Dep. Tr. 204:6-15; 205: 17-25]. On January 17, 2018, EcoNatura, NoXeno, FoxFire Edibles, Genovese, Fox and Pinkchuk executed a Mutual Non-Disclosure Agreement ("NDA"). [NoXeno SMF ¶ 16; J. Russano Aff. ¶ 56; Genovese Dep. Tr. 204:6-15; 205: 17-25; DE 174 ("Pl's Ex.") Pl's Ex. 29].

Following execution of the January 17, 2018 NDA, Genovese, Warren, Weber, Nick Moore (a lawyer from Atlanta), and Russano all began working on the NoXeno business plan, including preparing materials, such as slide presentations and executive summaries, to present to potential investors. [NoXeno SMF ¶ 17; J. Russano Aff. ¶¶ 16, 20; Genovese Dep. Tr. 365:22-25]. They also began trying to establish relationships and connections with others in the CBD market, including companies that could grow and/or provide CBD. *Id.*

In the meantime, Russano and EcoNatura continued to work with Genovese and Plaintiff regarding its potential customer (Medterra, still undisclosed to EcoNatura). [Noxeno SMF ¶ 18; J. Russano Aff ¶¶ 58, 62; Pl's SMF & JSUF ¶ 12; Genovese Dep. Tr. 212:9-18].

Using EcoNatura's Ruby Blue Bunny cream as the base,[10] the final CBD-based Pain Cream was comprised of the following ingredients:  Aloe barbadensis leaf juice; Ascorbic Acid; Cannabis Sativa (hemp) seed oil; Carthamus Tinctorius (Safflower) Seed Oil; Cetyl Alcohol (coconut fatty alcohol); Cintrus aurantifolia (lime) peel oil; Citrus medica limonum (lemon peel oil); Citrus uranium dulcis (orange) peel oil; Citrus aurantium bergamia (Bergamot) Fruit Oil; Glycerin;

---

[10] The original formula of the Ruby Blue Bunny base product was altered slightly.  This alteration is immaterial to the Plaintiff's claims against the Defendants.  [Pl's SMF & JSUF ¶¶ 15, 16].

Grapefruit Seed Extract; Helianthus annuus (sunflower) seed oil; Jojoba Seed Oil; Malaleuca alternifolia (tea tree) oil; Menthol; Mentha piperita (peppermint) oil; Montana (Arnica) Flower oil; Montana (Arnica) Flower water; Ocimum basilicum (basil) leaf oil; Olea Europaea (Olive) Fruit Oil; Persea Gratissima (Avocado) oil; Phenoxyethanol; Potassium Sorbate; Rosmarinus officinalis (rosemary) leaf extract; Salvia sclarea (Clary) oil; Sodium Hydroxide; Stearic Acid; Whole Plant Hemp-Derived Cannabis Sativa CBD; Xanthan Gum; and Zingiber officinale (Ginger) root oil. [Pl's SMF & JSUF ¶ 26]. This amounts to 2.25% menthol, 1% arnica, and 2% tea tree oil. [JSUF ¶ 32; J. Russano Aff. ¶ 72.]  The CBD-based Pain Cream was ready to go to market by the end of March 2018. [Pl's SMF & JSUF ¶ 19].

On March 26, 2018, Genovese asked Russano to produce a list of ingredients for the base of the CBD-based Pain Cream so that it could be shared with the customer for labeling purposes. [JSUF ¶ 21; J. Russano Aff. ¶¶ 65, 69; J. Russano Aff., Ex. at 40]. At that time, Russano did not know the customer was Medterra. *Id.*; Genovese Dep. Tr. 226:2-3. Upon this request, Russano prepared an ingredient list which identified the ingredients of the cream base in descending order based on the percentages of the ingredients to be included in the final product. *Id.*; Genovese Dep. Tr. 228:2-19. This document was titled "lotion ingredients in descending order 03292018" and was authored by Russano. [JSUF ¶ 21; J. Russano Aff. ¶ 66; Genovese Dep. Tr. 228: 4-6; J. Russano Aff. Ex. at 42].

On March 29, 2018, Russano emailed the ingredients to Genovese, and Genovese, in turn, provided the list to Medterra's Jay Hartenbach and J.P. Larsen that same day. [Pl's SMF & JSUF ¶ 22].  On March 29, 2018, Hartenbach replied to Genovese's email, asking what the concentration

of menthol and arnica would be in the CBD-based Pain Cream because Medterra was already selling a CBD "rapid cooling" cream with menthol and arnica. [JSUF ¶ 23; J.P. Larsen Decl. ¶ 6].

In the same March 29, 2018 email chain, Genovese responded to Hartenbach and Larsen, stating that arnica is 2%, tea tree oil is 1%, menthol is 0.5%, which attached pictures of these three ingredients' labels, but sent no other information to Medterra regarding the formulation for this CBD-based Pain Cream. [JSUF ¶ 24; Pl's Ex. 35].

Plaintiff does not know how the CBD-based Pain Cream was manufactured by Rejuvenol. [JSUF ¶ 25; Genovese Dep. Tr. 477:5-11]. Plaintiff does not know which of the information that it communicated to Russano was used or incorporated into the manufacturing process by EcoNatura or Rejuvenol. [JSUF ¶ 25; Genovese Dep. Tr. 514:4-9]. According to Genovese, he had "no insight into how Rejuvenol made the [CBD-based Pain Cream]" because it was "never shared with me." [Genovese Dep. Tr. 425:3-7, 477:5-8].

By April 15, 2018, Medterra made its first purchase order for the CBD-based Pain Cream. [JSUF ¶ 35; Pl's Ex. 14]. Medterra would purchase the CBD-based Pain Cream through Plaintiff on a white label basis and would then brand and sell the product under the Medterra brand. *Id.* Rejuvenol manufactured the products and shipped them directly to Medterra. *Id.* Medterra would then pay Plaintiff; Plaintiff would pay EcoNatura; and EcoNatura would pay Rejuvenol and other vendors involved in the distribution process. *Id.* Medterra's relationship with Plaintiff was at-will, i.e., Medterra could terminate it at any time. *Id.* ¶ 88. EcoNatura financially benefited from Plaintiff's business relationship with Medterra because Plaintiff and EcoNatura split all profits generated from the relationship. *Id.* ¶ 89.

Plaintiff's list of ingredients with percentages or weights for its alleged trade secret was emailed to EcoNatura on April 18, 2018. [Ex. 2 of J. Russano Aff. at 51; Genovese Dep. Tr. 19:13-18:1; 126:6-12; 160:17-24; 188:7-11; 445:19-446:5]. The email was sent from Genovese to Russano. *Id.* This list contains the amounts for menthol, arnica, tea tree, coconut oil, shea butter, cocoa butter, aloe vera, jojoba oil, grapefruit oil, the cream case, CBD, and emulsifying wax. *Id.* "EcoNatura never forwarded the April 2018 Email to, or shared its contents, with Medterra." *Id.* ¶ 52. In terms of the process of "blending and mixing" the ingredients or the "step-by-step manufacturing instructions," Plaintiff never provided that information to Medterra. *Id.* ¶¶ 53-54.

The first products that EcoNatura and Rejuvenol shipped to Medterra started in June 2018. Pl's SMF & JSUF ¶ 37. The CBD-based Pain Cream was a success and continued to sell through Medterra's brand from June 2018 through early 2019, when the relationship between EcoNatura and Plaintiff began to deteriorate. *Id.* ¶¶ 38-39; *see also* J. Russano Aff. ¶ 91.

On January 22, 2019, Genovese sent a non-disclosure agreement to EcoNatura. However, another company was listed in the agreement – Trinity Health Global LLC. [NoXeno SMF ¶ 20; Genovese Dep. Tr. 300: 13-301:1]. Genovese "assum[ed]" that Medterra would execute the agreement." [JSUF ¶ 36; Genovese Dep. Tr. 502:3-10]. However, Russano refused to sign the proposed agreement. [NoXeno SMF ¶ 21; Genovese Dep. Tr. 305:14-18].

On March 3, 2019, Genovese sent EcoNatura a "Subcontractor Agreement" for execution. This agreement contained language which purported to transfer any and all ownership interests to the CBD-based Pain Cream to Plaintiff. [NoXeno SMF ¶ 22; Genovese Dep. Tr. 317:22-319:7]. Russano and EcoNatura refused to sign this Agreement. [NoXeno SMF ¶ 23; Genovese Dep. Tr. 321:6-20].

In April of 2019, EcoNatura disclosed Plaintiff's profit margins to Medterra. [DE 149 ("Eco's MSJ") at 23; Pl's SMF ¶ 39]. Russano began to have doubts about EcoNatura's business relationship with Plaintiff, including that it was splitting profits 50/50 with Plaintiff for the sales of the CBD-based Pain Cream to Medterra, while EcoNatura was doing all of the production and distribution and Plaintiff was acting as just a "middleman." [Pl's SMF & JSUF ¶¶ 39; *see also* J. Russano Aff. ¶ 91].

Russano also took issue with Plaintiff's billing practices. [Pl's SMF & JSUF ¶ 40; *see also* J. Russano Aff. ¶ 98]. EcoNatura produced products that it was ready to ship, but Plaintiff had not paid EcoNatura for these products, and Plaintiff did not pay EcoNatura because Medterra had not satisfied the balance owed for products delivered. [Pl's SMF & JSUF ¶ 91]. On April 26, 2019, Russano was informed that Medterra had paid initial deposits on these outstanding invoices. [Pl's SMF & JSUF ¶ 94.; J. Russano Aff. ¶ 102]. Following this conversation, EcoNatura sent separate invoices directly to Medterra for the outstanding purchase orders, reflecting the deposits that Medterra had already made. [Pl's SMF & JSUF ¶ 95; Russano Aff. ¶ 103]. Medterra, in turn, paid EcoNatura directly what it was owed from Plaintiff. *Id.*

Eventually, on May 15, 2019, Genovese was sent a letter from Wise, President of NoXeno, informing him of NoXeno's intent to discontinue any involvement with Genovese. [NoXeno SMF ¶ 24; J. Russano Aff. ¶ 28, Genovese Dep. Tr. 376:1-9]. Following the termination of Genovese, NoXeno was forced to start over with respect to preparing material to present to potential investors. [NoXeno SMF ¶ 25; J. Russano Aff. ¶ 30]. This slowed the operational process down dramatically and, ultimately, the NoXeno Joint Venture simply never got off the ground. *Id.* NoXeno ceased operating in 2019. [NoXeno SMF ¶ 25; J. Russano Aff. ¶ 39]. Genovese does not know what

18

NoXeno did after receiving the May 15, 2019 letter, including whether NoXeno used Plaintiff's alleged trade secret [Genovese Dep. Tr. 381:21-25], whether NoXeno had any sales [Genovese Dep. Tr. 382:13-17], whether NoXeno received payments for the sale of a CBD product [Genovese Dep. Tr. 382:19-25], whether NoXeno obtained any investors [Genovese Dep. Tr. 383:4-8], and whether NoXeno has since been dissolved [Genovese Dep. Tr. 383:10-13].

On May 31, 2019, Genovese provided Medterra with samples of alternative formulations of CBD creams that Medterra could purchase from Plaintiff and Plaintiff could have produced by a developer other than EcoNatura for a lower cost. *Id.* ¶ 40; Pl's Ex. 25.  According to Medterra, the samples of the alternative formulations were watery and discolored and generally of poor quality.  [Pl's SMF & JSUF ¶ 40; J.P. Larsen Decl. ¶ 13].

On or about June 7, 2019, EcoNatura terminated its business relationship with Plaintiff. *Id.*; J. Russano Aff. ¶ 105; Genovese Dep. Tr. 384:1-15. At that time, Medterra decided to begin ordering the CBD-based Pain Cream directly from EcoNatura. *Id.*; J.P. Larsen Decl. ¶ 15. Following the termination of its business relationship with Plaintiff, EcoNatura has continued to produce the CBD-based Pain Cream at issue, through the Rejuvenol manufacturing facility, and continued to sell the CBD-based Pain Cream to Medterra. [Pl's SMF & JSUF ¶ 41].

## V.   DISCUSSION AND ANALYSIS

### A. FUTSA and DTSA claims against all Defendants

#### 1. *Allegations*

In Counts I and II of the complaint, Plaintiff raises a claim under FUTSA and DTSA against all Defendants. In the Complaint, Plaintiff identifies its claimed trade secret as Plaintiff's "formula for [Plaintiff's] proprietary CBD Cream," which "consists not only of the combination of specific

ingredients; it also includes the relative percentages of each individual ingredient and the manner in which the specific amount of each ingredient gets blended with the remaining ingredients to form the finished product." [Compl. ¶¶ 59, 68; *see id.* ¶¶ 61, 71 ("Accordingly, the formula for [Plaintiff's] CBD Cream is a trade secret under Florida law.")].

Plaintiff alleges that Plaintiff "entrusted [Defendants] with highly sensitive confidential information including, without limitation, the formula for [Plaintiff's] proprietary CBD Cream." *Id.* ¶¶ 62; 72. Moreover, each of the Defendants was aware that Plaintiff's disclosure to each of them of the formula for the CBD Cream was done strictly in furtherance of the parties' business relationship and that Plaintiff never authorized any of the Defendants to use or disclose the formula for Plaintiff's CBD Cream other than in furtherance of the confidential business relationship between Plaintiff, Medterra, EcoNatura, Rejuvenol, and NoXeno. *Id.* ¶¶ 63, 73.

Plaintiff alleges that "[Defendants] misappropriated the formula for [Plaintiff's] CBD Cream by continuing to use same outside of the parameters of any business relationship with [Plaintiff] and without [Plaintiff's] consent, by which the Defendants have reaped significant profits in connection therewith - none of which have been distributed to [Plaintiff]." *Id.* ¶¶ 64, 74. "This was done willfully and maliciously and is a direct and proximate cause of Plaintiff's damages." *Id.* ¶¶ 64- 65, 74-75.

It is clear to the Court that the complaint in this case alleges that the trade secret is the end product CBD-based Pain Cream, and the manner in which the CBD cream's ingredients blend to "form the finished product." *See* Compl. ¶¶ 59-76.  As detailed *supra*, in the complaint, the trade secret is defined as follows: the "CBD Cream formula consists not only of the combination of specific ingredients; it also includes the relative percentages of each individual ingredient and the

20

manner in which the specific amount of each ingredient gets blended with the remaining ingredients to form a finished product." *Id.* Plaintiff further alleges in its complaint that "[Plaintiff's] CBD Cream is a trade secret," and Defendants "misappropriated the formula for [Plaintiff's] CBD Cream by continuing to use same … without [Plaintiff's] consent …." *Id.* ¶¶ 64, 74.

However, in response in opposition to summary judgment, Plaintiff has belatedly redefined the alleged formula as comprising only the concentrations and manufacturing process for four individual ingredients (CBD, menthol, tea tree oil, and arnica). [Pl's SMF ¶ 106].  Specifically, now, Plaintiff's position is that "[t]he Secret Formulation … was for a combination of precise concentrations of CBD, the manufacturing process for the CBD (time, temperature, mixing rate, and others), along with the complementary active ingredients at specific concentrations for pain relief (menthol, tea tree oil, and arnica)." *Id.*  To be sure, in Plaintiff's Statement of Material Facts, Plaintiff states "[t]he Secret Formulation is not the formulation and procedure for making the end product (the topical cooling cream). Rather, it is the formulation and procedure for the core of the product that produces the therapeutic effect." *Id.* ¶ 108.  Plaintiff adds that its formulation is "not [for] the entire end product," *Id.* ¶¶ 54-55, and that its "Secret Formula" includes only the "core ingredients" of certain percentages of menthol, arnica, tea tree oil, NF emulsifying wax and CBD (without a disclosed percentage). *Id.* ¶ 110.

This is not an insignificant change in Plaintiff's theory of misappropriation, and Plaintiff cannot materially change its theory under Counts I and II at this late stage—after discovery is closed and after summary judgment has been sought against it.  *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) ("[A] plaintiff cannot amend his

complaint through argument made in his brief in opposition to the defendant's motion for summary judgment."); *Aning v. Fed. Nat'l Mortgage Ass'n,* 663 Fed. Appx. 773, 775 (11th Cir. 2016) ("[A] response to a summary judgment motion cannot create a new claim or theory of liability.").

Moreover, Plaintiff's deposition reveals that Plaintiff believes that the Defendant misappropriated the final cream product. *See* Genovese Dep. Tr. 424:13-14 ("We are saying the product is misappropriated."); Genovese Dep. Tr. 425: 19-20 ("It's the product has been misappropriated."); Genovese Dep. Tr. 504:1-2 ("[M]y product is the IP. That's what they have, and they are still using it."); Genovese Dep. Tr. 504:6-8 ("They have—they are still using my formulation or [Plaintiff's] formulation that was branded under the Pharmalieve [label] for their own use."); Genovese Dep. Tr. 505:7-11 ("I'm saying they are still buying the product that was made for Pharmalieve specifically, that we offered them a white-label opportunity in May 2018, they are still buying it even though they stopped going through us as of June 2019. They are still buying that product today.").

The Court therefore decides Counts I and II by their allegations as stated in the complaint. That is, Plaintiff's trade secret is the end product CBD-based Pain Cream, and the manner in which the CBD cream's ingredients blend to "form the finished product." *See* Compl. ¶¶ 59-76.

### 2. *Elements*

Plaintiff brings parallel claims under the DTSA and Florida's trade-secret statute, the FUTSA.[11] The DTSA provides a federal cause of action to "[a]n owner of a trade secret that is

---

[11]Aside from the issue of "ownership" (which is not at issue with respect to the present motion), a FUTSA and DTSA claim are essentially the same and the Court addresses the claims together. *See Temurian v. Piccolo*, No. 18-cv-62737, 2019 WL 1763022, at *10 (S.D. Fla. Apr. 22, 2019); *Hurry Fam. Revocable Tr. v. Frankel*, No. 8:18-cv-2869, 2019 WL 6311115, at *13 (M.D. Fla. Nov. 25, 2019).

misappropriated ... if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). To establish a violation of the DTSA, a plaintiff must show (1) it owns a valid trade secret; (2) the trade secret relates to a product or service used in, or intended for use in, interstate commerce; and (3) a defendant misappropriated that trade secret. *See IT Works Mktg., Inc. v. Melaleuca, Inc*., No. 8:20-cv-1743, 2021 WL 1650266, at *7 (M.D. Fla. Apr. 27, 2021) (citation omitted).

The DTSA defines a "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing[.]" 18 U.S.C. § 1839(3) (quotation marks omitted). Information will not be considered a trade secret unless: (1) "the owner [ ] has taken reasonable measures to keep such information secret;" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]" *Id.*

A misappropriation occurs when: "(1) a person acquires the trade secret while knowing or having reason to know that he or she is doing so by improper means; (2) a person who has acquired or derived knowledge of the trade secret discloses it without the owner's consent; or (3) when a person who has acquired or derived knowledge of the trade secret uses it without the owner's consent." *Frankel*, 2019 WL 6311115, at *13 (quotation marks and citation omitted). "Put another way, the DTSA contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use."

23

*Florida Beauty Flora Inc. v. Pro Intermodal L.L.C.*, 20-20966-CIV, 2021 WL 1945821, at *4 (S.D. Fla. May 14, 2021) (quotation marks, citation, and alteration omitted).

Similarly, the FUTSA provides civil remedies for the misappropriation of trade secrets. *See* §§ 688.001–009, Fla. Stat. "To prevail on a FUTSA claim, a plaintiff must demonstrate that (1) it possessed a trade secret and (2) the secret was misappropriated." *Yellowfin Yachts, Inc. v. Barker Boatworks*, LLC, 898 F.3d 1279, 1297 (11th Cir. 2018) (quotation marks and citations omitted).

The FUTSA defines a "trade secret" as "information that: (a) derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 (11th Cir. 2020) (quoting § 688.002(4), Fla. Stat.). Misappropriation includes "'acquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means' as well as use of that trade secret 'without express or implied consent by a person who [ ] used improper means to acquire knowledge of the trade secret; or knew or had reason to know that her or his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.'" *Scanz Techs., Inc. v. JewMon Enters., LLC*, No. 20-22957-Civ, 2021 WL 65466, at *7 (S.D. Fla. Jan. 7, 2021) (quoting § 688.002(2), Fla. Stat.); *see also Compulife Software Inc.*, 959 F.3d at 1311 ("One party can misappropriate another's trade secret by either acquisition, disclosure, or use." (citing § 688.002(2), Fla. Stat.)). "Information that is generally known or readily accessible to third parties cannot qualify for trade secret protection." *Am. Red Cross v. Palm Beach*

24

*Blood Bank, Inc*., 143 F.3d 1407, 1410 (11th Cir. 1998) (citing *Bestechnologies, Inc. v. Trident Envtl. Sys., Inc*., 681 So. 2d 1175, 1176 (Fla. 2d DCA 1996)).

Stated simply, to prevail on a claim for misappropriation of trade secrets, a plaintiff must establish both of the following: (1) it possessed secret information and took reasonable steps to protect its secrecy; and (2) the secrets it possessed were misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it. *Xtec, Inc. v. Cardsmart Techs., Inc*., No. 11-22866, 2014 WL 10268426, at *7 (S.D. Fla. May 15, 2014) (citing § 688.002, Fla. Stat.); *see also* 18 U.S.C. § 1836(b)(1) (setting forth similar elements).

### 3. *NoXeno is entitled to summary judgment on Counts I and II*

The Court easily finds that summary judgment shall be granted in favor of NoXeno on Counts I and II for several reasons.

First, the Court finds that Plaintiff's failure to respond to any of the arguments raised in NoXeno's motion waived any challenge to NoXeno's arguments. *See Palm Beach Polo, Inc. v. Vill. of Wellington*, 19-80435-CIV, 2021 WL 2499008, at *5 (S.D. Fla. May 14, 2021) ("A court may find that a party waived any challenge to arguments which it did not address in its response to a summary judgment motion.") (citing *Schwarz v. Bd. of Supervisors on behalf of Villages Cmty. Dev. Districts*, 672 F. App'x 981, 983 (11th Cir. 2017)); *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

Second, Plaintiff failed to respond to NoXeno's statement of material facts, and thus has admitted to NoXeno's statement if supported by the record. *Ibezim v. GEO Grp., Inc*., No. 17-

80572-CIV, 2018 WL 8222121, at *8 (S.D. Fla. July 6, 2018) (where the non-moving party fails to file a statement of disputed material facts, the court has the discretion to deem admitted all undisputed facts presented by the moving party which are supported by evidence in the record and may ultimately enter summary judgment in the moving party's favor since the court is effectively left with an unopposed motion for summary judgment); *Chicken Kitchen USA, LLC v. Maiden Specialty Ins. Co.,* No. 14-23282-CIV, 2016 WL 4542126, at *2 (S.D. Fla. Aug. 31, 2016) (failure of a respondent to file a statement of disputed facts causes all material facts set forth in the movant's statement to be deemed admitted unless controverted by the opposing party's statement); *see also* Fed. R. Civ. P. 56(e)(4); S.D. Fla. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required ... will be deemed admitted unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record.").

The Court finds that NoXeno's statement of facts is supported by the record. NoXeno is a failed business venture and did not misappropriate Plaintiff's alleged trade secret. NoXeno never sold products or generated any revenues [NoXeno SMF ¶¶ 46-49; Genovese Dep. Tr. 382:13-25; J. Russano Aff. ¶¶ 34-36]; NoXeno has not advertised or solicited any goods or services [NoXeno SMF ¶ 44; Genovese Dep. Tr. 372:1-11]; NoXeno was never involved in the production or sale of CBD-based products by EcoNatura or Medterra [NoXeno SMF ¶¶ 46, 50, 52; Genovese Dep. Tr. 382:13-21-25; Russano Aff. ¶ 38]; NoXeno ultimately never presented anything to any potential investors [NoXeno SMF ¶¶ 44-45; Genovese Dep. Tr. 372:1-11; J. Russano Aff. ¶¶ 33-34]; and NoXeno is no longer in operation and has not been since 2019. [NoXeno SMF ¶¶ 26-27; Russano Aff. ¶ 39]. Plaintiff further confirmed in its corporate representative deposition that it had no

information or evidence that NoXeno used any of the claimed trade secrets forming the basis of Plaintiff's complaint. [NoXeno SMF ¶ 51; Genovese Dep. Tr. 444:2-6, 519:1- 11].

Third, even in looking to Plaintiff's response to the Joint Statement of Undisputed Material Facts and Plaintiff's own submitted facts as it relates to NoXeno, summary judgment is due to be granted in favor of NoXeno.  Plaintiff's facts mention NoXeno or the alleged joint venture only three times. [Pl's SMF ¶¶ 136, 153, 160].  And each fact fails to include a citation to record evidence. *Id.* These facts are properly disregarded by the Court as a result of Plaintiff's utter failure to properly rebut the NoXeno's position in summary judgment. *See* Fed. R. Civ. P. 56(e); S.D. Fla. L.R. 56.1(c), (d).

Accordingly, Plaintiff cannot establish any elements of misappropriation pursuant to FUTSA and DTSA as to NoXeno.  Therefore, summary judgment shall be granted in favor of NoXeno as to Counts I and II.

### 4.   *Rejuvenol is entitled to summary judgment in its favor on Counts I and II*

The Court finds that summary judgment shall be granted in favor of Rejuvenol on Counts I and II as there is no genuinely disputed issue of material fact and Rejuvenol is entitled to summary judgment in its favor as a matter of law.

There is no genuine factual dispute regarding misappropriation as it relates to Rejuvenol. Although Plaintiff "disputes" some of the facts relating to Rejuvenol, Rejuvenol's facts in favor of summary judgment are clearly supported by the record. Rejuvenol put forth evidence that Plaintiff does not know how the CBD-based Pain Cream was manufactured by Rejuvenol. [JSUF ¶ 25; Genovese Dep. Tr. 477:5-11]. Plaintiff does not know which of the information that it communicated to Russano was used or incorporated into the manufacturing process by Rejuvenol. [JSUF ¶ 25; Genovese Dep. Tr. 514:4-9].  Plaintiff had "no insight into how Rejuvenol made the

[CBD-based Pain Cream]" because it was "never shared with me." [Genovese Dep. Tr. 425:3-7, 477:5-8]. Rejuvenol was paid by EcoNatura, not Plaintiff. [JSUF ¶ 35; Pl's Ex. 14]. Plaintiff never provided Rejuvenol with "step-by-step" instructions on how to manufacture a cream using the ingredient list Plaintiff provided to EcoNatura in the April 2018 email. [Pl's SMF & JSUF ¶ 54]. At no time did Rejuvenol receive any communications, instructions, or other information from Plaintiff, or any of its principals, including Genovese or Romero, regarding the formulation of the CBD-based Pain Cream. [JSUF ¶ 17; J. Bastardo Decl. ¶ 12]. Rejuvenol put forth evidence that it did not use the same process that Plaintiff alleges was its trade secret. [Russano Aff. ¶¶ 74-76].

Plaintiff argues that EcoNatura represented to Plaintiff that Russano was a principal or agent of Rejuvenol. [P's Response at 10]. In support, Plaintiff points to Plaintiff's corporate representative deposition, where Genovese testifies that he assumed Russano was an owner of the factory. [Genovese Dep. Tr. 201: 4-20]. However, it is undisputed that no Rejuvenol employee has been involved in any meetings between representatives of Plaintiff and EcoNatura pertaining to any formulation or products. [Pl's SMF & JSUF ¶ 18 (paragraph 18 is actually disputed by Plaintiff, but Plaintiff only disputes paragraph 18 as it relates to EcoNatura); Bastardo Decl. ¶ 13]. Regardless, the owner of the Rejuvenol facility is irrelevant to Counts I and II in Plaintiff's complaint. Additionally, as revealed during oral argument, Plaintiff did not propound any discovery in this case where it could have fully investigated its claims against Rejuvenol that it misappropriated Plaintiff's alleged trade secret. Plaintiff has not met its burden to refute Rejuvenol's entitlement to summary judgment here.

It is undisputed that Rejuvenol worked with EcoNatura to manufacture the CBD-based Pain Cream and that is the totality of Rejuvenol's involvement in this case. Plaintiff cannot

establish that Rejuvenol "deceived" it into disclosing its list of "key ingredients" or that Plaintiff "could not have reasonably avoided" its purported injuries in this case.  Moreover, assuming for the sake of argument that Plaintiff possessed a trade secret, there is no evidence that the information of the alleged trade secret process was conveyed to, or used by, Rejuvenol as required by FUTSA or DTSA to establish a claim for misappropriation. *See* § 688.002, Fla. Stat.; 18 U.S.C. § 1836(b)(1). Therefore, summary judgment shall be granted in favor of Rejuvenol as to Counts I and II.

### 5. *Medterra is entitled to summary judgment in its favor on Counts I and II*

The Court finds that summary judgment shall be granted in favor of Medterra on Counts I and II as there is no genuinely disputed issue of material fact and Medterra is entitled to summary judgment in its favor as a matter of law.

There is no genuine factual dispute regarding misappropriation as it relates to Medterra. In sum, Plaintiff's position is that Medterra misappropriated Plaintiff's alleged trade secret because (a) Medterra was bound to the January 17, 2018 Mutual Non-Disclosure Agreement signed in relation to the NeXeno Joint Venture; and (b) Medterra knew Plaintiff has a trade secret in the CBD-based Pain Cream and "nevertheless proceeded to commercially utilize the formula in order to generate significant profits[.]" Compl. ¶ 65; *see* Pl's Response at 8, 10; Pl's SMF ¶ 80 ("MedTerra could ***not*** use Plaintiff's Secret Formula to purchase products from someone other than Plaintiff.") (emphasis in the original); Pl's SMF ¶ 81 ("MedTerra [is] prohibited from selling products that were manufactured using Plaintiff's Secret Formula.").

Assuming for a moment that Plaintiff has a trade secret, and even assuming that Medterra was bound to the January 17, 2018 NDA (even though Medterra was not a party to the NDA), there is no genuine factual dispute regarding misappropriation as it relates to Medterra. It is

29

undisputed that "[Plaintiff] is claiming that the 'highly sensitive and confidential' information it disclosed to Medterra is the 'ingredient list' set forth in the April 2018 Email." [Pl's SMF & JSUF ¶ 51]. It is undisputed that "EcoNatura never forwarded the April 2018 Email to, or shared its contents, with Medterra." *Id.* ¶ 52. In terms of the process of "blending and mixing" the ingredients or the "step-by-step manufacturing instructions," Plaintiff never provided that information to Medterra. *Id.* ¶¶ 53-54. [JSUF ¶ 35; Pl's Ex. 14]. It is undisputed that Medterra's relationship with Plaintiff was at-will, i.e., Medterra could terminate it at any time. *Id.* ¶ 88.

It is true that Plaintiff directly disclosed a list that was created by EcoNatura of the ingredients in descending order based on the percentages of the ingredients in the CBD-based Pain Cream; Plaintiff directly disclosed to Medterra that the CBD-based Pain Cream contained certain percentages of menthol, arnica, and tea tree oil; and Plaintiff attached pictures of these three ingredients' labels, allowing Medterra to know the source of the three ingredients. But Plaintiff has not provided any rebuttal evidence that Medterra knew the CBD-based Pain Cream was Plaintiff's alleged trade secret or knew any of the process or instructions on how the CBD-based Pain Cream was manufactured. Plaintiff provided only a partial ingredient list to Medterra, which included Plaintiff's alleged "key ingredients," but only the tea tree oil was the same percentage as that which Plaintiff alleges is part of the trade secret.

Medterra is simply a retailer. It does not employ chemists, it does not have a lab, it does not formulate or manufacture anything, and it is undisputed that Medterra and Plaintiff's relationship was at will. Plaintiff cannot establish that Medterra used, acquired, or disclosed any of Plaintiff's confidential or proprietary information, given that all Plaintiff provided to Medterra was a partial ingredient list that it obtained from EcoNatura. Further, Plaintiff cannot establish that

Medterra "deceived" it into disclosing its list of "key ingredients" or that Plaintiff "could not have reasonably avoided" its purported injuries in this case.

Accordingly, assuming Plaintiff possessed a trade secret, there is no evidence that the information amounting to the alleged trade secret was conveyed to Medterra and there is no evidence that Medterra used or disclosed that information, as required by FUTSA or DTSA to establish a claim for misappropriation. *See* § 688.002, Fla. Stat.; 18 U.S.C. § 1836(b)(1). Therefore, summary judgment shall be granted in favor of Medterra as to Counts I and II.

### 6. *EcoNatura is not entitled to summary judgment in its favor on Counts I and II*

The Court finds that summary judgment shall be denied on Counts I and II as alleged against EcoNatura because EcoNatura has not met its burden on summary judgment.

EcoNatura puts forth evidence by way of Russano's affidavit on behalf of EcoNatura to support its position that the CBD-based Pain Cream starts with its Ruby Blue Bunny base cream, then it is combined with the arnica, CBD, menthol, tea tree oil and peppermint oil. [J. Russano Aff. ¶ 73]. All of the ingredients used for the CBD-based Pain Cream were either previously used in connection with the Ruby Blue Bunny products or were used in connection with other products EcoNatura had developed prior to ever being introduced to Plaintiff or Genovese. There is not an ingredient used for the CBD-based Pain Cream that is original to Plaintiff or Genovese. [J. Russano Aff. ¶ 107]. None of the sources, e.g., manufacturers of ingredients initially used to develop the CBD-based Pain Cream while EcoNatura had a business relationship with Plaintiff, have been used since termination of the relationship. The only ingredient that Plaintiff ever sourced for the Medterra product was the original batch of arnica that was used in 2018. Once that batch was exhausted EcoNatura obtained arnica from its own, different source. [J. Russano Aff. ¶ 107].

EcoNatura also puts forth evidence by way of its expert's report. Evan Boyst, a formulation chemist, opined that the ingredients set forth in the April 2018 email are "neither secret nor unique in topical creams." [Pl's SMF & JSUF ¶¶ 67-68; DE 146-5 ("Boyst Summary") ¶ 28]. Moreover, the listed ingredients, including the Plaintiff's alleged "key ingredients" of menthol, arnica, and tea tree oil, are "generally known and regularly used in numerous CBD topical creams, lotions or balms." [Pl's SMF & JSUF ¶ 68; Boyst Summary ¶ 28]. In addition, the April 2018 email listing "commonplace and generally known" ingredients is, by itself, not enough information "to develop a topical cooling cream without additional, material information," including mixing instructions; heating and cooling instructions; and the refinement, grade or quality of the ingredients. [Boyst Summary ¶ 33]. In comparing the ingredients listed in the April 2018 email with the ingredients listed on the label for the CBD-based Pain Cream, expert Boyst concludes that there are material differences between the two set of ingredients. [Boyst Summary ¶ 37].

It is undisputed that Plaintiff has not performed any laboratory testing of the CBD-based Pain Cream to determine whether it is the same set of ingredients or alleged formula identified in the April 2018 email. [Pl's SMF & JSUF ¶ 75; Genovese Dep. Tr. 470:14-471:1; 479:15-481:1; 488:13-489:6]. Moreover, it is also undisputed that, although Genovese testified that he had handwritten notes to document the creation of alleged trade secret formula and process, Genovese has never produced any handwritten notes.  [Genovese Dep. Tr 20:11-23; 66:10-11; 87:21-25; 419:15-17; 509:5-510-16]. In fact, during his video teleconference deposition (Genovese appeared from his home), Genovese said these handwritten notes were in his attic, but when counsel asked Genovese to retrieve these notes, Genovese failed to do so. *Id.* As confirmed during oral argument, the handwritten notes were not produced during discovery and were not turned over during the deposition.

However, there is evidence in the record that Plaintiff sent to EcoNatura a list of ingredients with their amounts. [J. Russano Aff. Ex. at 51; Genovese Dep. Tr. 19:13-18:1; 126:6-12; 160:17-24; 188:7-11; 445:19-446:5]. Plaintiff also put forth evidence that from January 2018 to July 2018, there were several calls between Genovese and Russano where Genovese explained the trade secret process, the "process by which ingredients were heated and cooled during the manufacturing process." **[**Genovese Dep. Tr. 49:1-17, 55:24-56:3, 58:23-60:7; 420:10-21; 477:3-4].

In viewing the evidence in the light most favorable to Plaintiff, whether EcoNatura misappropriated Plaintiff's alleged trade secret is a question of fact to be determined by the jury after a full presentation of evidence from each side. *Digiport, Inc. v. Foram Dev. BFC, LLC*, 314 So. 3d 550, 553 (Fla. 3d DCA 2020) (denying summary judgment when there was a genuine issue as to whether certain readily ascertainable elements, when viewed together, may still qualify as a trade secret); *Furmanite Am., Inc. v. T.D. Williamson, Inc.,* 506 F. Supp. 2d 1134, 1141 (M.D. Fla. 2007) ("The question of whether an item ... constitutes a 'trade secret' is of the type normally resolved by a fact finder after full presentation of evidence from each side.").

Even though the end product is comprised of 94% of the base cream, and Plaintiff has abandoned its allegation that the trade secret is the end product CBD-based Pain Cream, there is a genuine issue of material fact as to whether the manner in which the CBD cream's ingredients blend to "form the finished product" is Plaintiff's trade secret, and whether it was misappropriated by EcoNatura. *See* Compl. ¶¶ 59-76. Moreover, although Genovese's testimony regarding the trade secret "process" and his description of these alleged conversations may be sparce, the Court finds that a credibility determination is required to determine the misappropriation Counts against EcoNatura. For these reasons, summary judgment shall not be granted on Counts I and II. These Counts shall proceed to trial as to EcoNatura.

33

### B. FDUTPA claim against Noxeno, EcoNatura, and Medterra

#### 1. *Allegations*

In Count III of the complaint, Plaintiff raises a claim under FDUTPA against NoXeno, Medterra, and EcoNatura.  Plaintiff alleges that "[Plaintiff], Medterra, EcoNatura and NoXeno were engaged in the conduct of a trade or commerce . . . by virtue of EcoNatura's production of the CBD Cream primarily based upon [Plaintiff's] proprietary formula on behalf of Medterra as a wholesale customer for purposes of enabling Medterra to ultimately resell the CBD Cream to retail customers. The revenues from such sales were touted by NoXeno to prospective investors as a proof of concept for purposes of encouraging outside capital infusion into the NoXeno joint venture."   Compl. ¶ 78.

Plaintiff alleges that it "was the architect of its business relationship with Medterra and EcoNatura, since Medterra was an existing client of [Plaintiff's] at the time [Plaintiff] retained EcoNatura to produce the CBD Cream on Medterra's behalf[.]" *Id.* ¶ 79.  "Additionally, [Plaintiff's] proven track record of revenue generation with CBD products enabled NoXeno to portray itself to prospective investors as a profitable enterprise to the extent NoXeno relied upon [Plaintiff's] sales history and product line in NoXeno's marketing materials." *Id.*

Plaintiff alleges that the Defendants knew that Medterra was a preexisting client of Plaintiff's and Plaintiff "emphasized to Medterra that EcoNatura was Plaintiff's subcontractor and that any communications between Medterra and EcoNatura needed to be disclosed to [Plaintiff]." *Id.* ¶¶ 80, 81. "Nevertheless, Medterra, EcoNatura and NoXeno eventually formed a new, competing business relationship from which [Plaintiff] was excluded[.]" *Id.* ¶ 82.  Moreover, Plaintiff "believes that EcoNatura has capitalized upon [Plaintiff's] ideas for a CBD-based roll-on

as well as a psoriasis cream by producing these items for sale to Medterra and other wholesale customers, the revenues from which are being used to solicit new investors for NoXeno, subsequent to the Defendants' exclusion of [Plaintiff] from the parties' ongoing business relationship." *Id.*

Plaintiff alleges that, by excluding it out of the arrangement and by selling Plaintiff's "proprietary CBD Cream formula under circumstances where Medterra, EcoNatura and NoXeno were aware that such continued utilization was unauthorized, Medterra, EcoNatura and NoXeno therefore engaged in unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices in the conduct of a trade or commerce as prohibited by Florida Statutes §501.204(1)." *Id.* ¶¶ 82-83.

Stated simply, the allegations of the FDUTPA claim in the complaint amount to this: NoXeno, Medterra and EcoNatura violated FDUTPA by (a) excluding Plaintiff out of the new business arrangement; and (b) selling Plaintiff's trade secret formula. EcoNatura additionally violated FDUTPA by (c) using Plaintiff's ideas for other products by producing these other products and selling them to Medterra. NoXeno violated FDUTPA by (d) using EcoNatura's revenues from its sales to Medterra to solicit new investors for NoXeno, to which Plaintiff was excluded.

### 2. *Elements*

To prevail on a FDUTPA claim, a plaintiff must show (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages. *State Farm Mut. Auto. Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1300 (S.D. Fla. 2018) (citing *Hucke v. Kubra Data Transfer, Corp.*, 160 F.Supp.3d 1320, 1328 (S.D. Fla. 2015)). A practice is

deceptive under FDUTPA when "there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)). "[A]n unfair practice is one which causes substantial injury to a consumer which the consumer could not have reasonably avoided and which is not outweighed by countervailing benefits to the consumer or to competition." *Angelo v. Parker*, 275 So. 3d 752, 755 (Fla. 1st DCA 2019), *reh'g denied* (July 25, 2019) (quoting *Hill Dermaceuticals, Inc. v. Anthem, Inc.*, 228 F.Supp.3d 1292, 1302 (M.D. Fla. 2017)).

### 3.  *NoXeno is entitled to summary judgment on Count III*

The Court easily finds that summary judgment shall be granted in favor of NoXeno on Count III for several reasons.  As explained *supra,* the Court finds that Plaintiff's failure to respond to the arguments in NoXeno's motion has waived any challenge to NoXeno's arguments. Plaintiff failed to respond to NoXeno's statement of disputed material facts, and thus has admitted to NoXeno's statement if supported by the record, and none of Plaintiff's facts that relate to NoXeno include a citation to record evidence.

The Court finds that NoXeno's statement of facts is supported by the record.  NoXeno is a failed business venture and did not violate FDUTPA. Clearly, NoXeno never engaged in trade of commerce. As stated *supra,* NoXeno never sold products or generated any revenues [NoXeno SMF ¶¶ 46-49; Genovese Dep. Tr. 382:13-25; J. Russano Aff. ¶¶ 34-36]; NoXeno has not advertised or solicited any goods or services [NoXeno SMF ¶ 44; Genovese Dep. Tr. 372:1-11]; NoXeno was never involved in the production or sale of CBD-based products by EcoNatura or Medterra [NoXeno SMF ¶¶ 46, 50, 52; Genovese Dep. Tr. 382:13-21-25; Russano Aff. ¶ 38]; NoXeno ultimately never presented anything to any potential investors; [NoXeno SMF ¶¶ 44-45;

Genovese Dep. Tr. 372:1-11; J. Russano Aff. ¶¶ 33-34]; and NoXeno is no longer in operation and has not been since 2019. [NoXeno SMF ¶¶ 26-27; Russano Aff. ¶ 39]. Moreover, the alleged unfair or deceptive acts undertaken by NoXeno involve either soliciting potential investors or forming a competing business relationship with EcoNatura and Medterra. There is no rebuttal evidence that NoXeno did either. [NoXeno SUMF ¶¶ 26-27, 44-46, 53]. Accordingly, summary judgment shall be granted in favor of NoXeno as to Count III.

### 4.  *Medterra is entitled to summary judgment on Count III*

The Court finds that summary judgment shall be granted in favor of Medterra on Count III because Plaintiff's FDUTPA claim against Medterra is preempted by its FUTSA claim.

The FUTSA preempts certain "conflicting tort, restitutory, and other laws of this state providing civil remedies for misappropriation of a trade secret."   § 688.008(1), Fla. Stat. The law does not affect "[o]ther civil remedies that are not based upon misappropriation of a trade secret[.]" § 688.008(2), Fla. Stat.; *see Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1180 (M.D. Fla. 2005) ("FUTSA preempts all claims, other than claims *ex contractu*, based on misappropriation of trade secrets.").

"To determine whether allegations of trade-secret misappropriation preempt a plaintiff from sufficiently pleading a separate, but related tort, the Court must evaluate 'whether allegations of trade secret misappropriation alone comprise the underlying wrong; if so, the cause of action is barred by § 688.008.'" *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1294-95 (S.D. Fla. 2018) (citation omitted). "Thus, a plaintiff's separate tort claim is preempted by [the] FUTSA if there is no material distinction between the plaintiff's FUTSA claim and the other allegation." *Id.* at 1294–95 (quotation marks and citations omitted). "In other words, the allegations must be

separate and distinct." *ThinkLite LLC v. TLG Sols*., LLC, No. 16-24417-Civ, 2017 WL 5972888, at *4 (S.D. Fla. Jan. 31, 2017) (citation omitted).

The Court discerns no material distinction between the FUTSA claim and the FDUTPA claim against Medterra. Indeed, the underlying wrong in each of those claims is limited to trade secret misappropriation. *Compare* Compl. ¶ 78 ("Medterra . . .[was] engaged in the conduct of a trade or commerce . . . by virtue of EcoNatura's production of the CBD Cream primarily based upon [Plaintiff's] proprietary formula on behalf of Medterra as a wholesale customer for purposes of enabling Medterra to ultimately resell the CBD Cream to retail customers."); *id.* ¶ 82 ("Medterra, EcoNatura and NoXeno eventually formed a new, competing business relationship from which [Plaintiff] was excluded[.]"); *id.* ¶¶ 82-83 (By excluding Plaintiff out of the arrangement and by selling Plaintiff's "proprietary CBD Cream formula under circumstances where Medterra . . . [was] aware that such continued utilization was unauthorized, Medterra . . . therefore engaged in unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices in the conduct of a trade or commerce as prohibited by Florida Statutes §501.204(1)), *with id.* ¶¶ 62; 72 (Plaintiff "entrusted [Defendants] with highly sensitive confidential information including, without limitation, the formula for [Plaintiff's] proprietary CBD Cream."); *id.* ¶¶ 63, 73 ("[E]ach of the Defendants was aware that [Plaintiff's] disclosure to each of them of the formula for the CBD Cream was done strictly in furtherance of the parties' business relationship and that [Plaintiff] never authorized any of the Defendants to use or disclose the formula for [Plaintiff's] CBD Cream other than in furtherance of the confidential business relationship between [Plaintiff], Medterra, EcoNatura, Rejuvenol and NoXeno."); *id.* ¶¶ 64; 74 ("Medterra[] . . . misappropriated the formula for [Plaintiff's] CBD Cream by continuing to use same outside of the parameters of any business relationship with [Plaintiff] and without

[Plaintiff's] consent, by which the Defendants have reaped significant profits in connection therewith - none of which have been distributed to [Plaintiff].""). As such, the only unfair or deceptive practice alleged is the same conduct which forms the basis of Plaintiff's misappropriation claims in Counts I and II, and there is no material distinction between the FUTSA claim and the claim FDUTPA claim against Medterra.

The only other allegation in Plaintiff's FDUTPA claim that remotely involves Medterra is that Plaintiff "believes that EcoNatura" has misappropriated other proprietary ideas belonging to Plaintiff. *Id.* ¶ 82 (Plaintiff "believes that EcoNatura has capitalized upon [Plaintiff's] ideas for a CBD-based roll-on as well as a psoriasis cream by producing these items for sale to Medterra and other wholesale customers, the revenues from which are being used to solicit new investors for NoXeno, subsequent to the Defendants' exclusion of [Plaintiff] from the parties' ongoing business relationship."). Clearly this allegation involves the conduct of EcoNatura and NoXeno, and Plaintiff fails to allege that Medterra's purchase of other products from EcoNatura is a deceptive act or unfair practice.

In sum, Plaintiff fails to identify a material distinction between its FUTSA claim and the claim asserted in Count III. Thus, the Court finds that Count III is preempted by FUTSA. Accordingly, summary judgment will be entered in favor of Medterra on Count III. *Florida Beauty Flora Inc.*, 20-20966-CIV, 2021 WL 1945821, at *9 (granting summary judgment where Plaintiff failed to identify a material distinction between its FUTSA claim and a claim that asserted similar facts); *see also Development Techs Developmental Techs., LLC v. Valmont Indus., Inc.*, No. 8:14-CV-2796-MSS-JSS, 2016 WL 7320908, at *3–4 (M.D. Fla. July 18, 2016) (granting defendants'

motion for judgment on the pleadings as to the FDUTPA claims because the "FDUTPA claims are not materially distinct" from the FUTSA claim).

### 5. *EcoNatura is entitled to summary judgment on Count III*

The Court finds that summary judgment shall be granted in favor of EcoNatura on Count III because Plaintiff's FDUTPA claim against EcoNatura is preempted by its FUTSA claim.

Aside from the separate claim that Defendants capitalized on Plaintiff's alleged ideas for a roll-on product and a psoriasis cream product, Plaintiff's FDUTPA claim against EcoNatura (like Medterra) is premised entirely on the allegation that Defendants should be held liable because they continued to produce and sell a CBD cream product based on Plaintiff's proprietary formula. *Compare* Compl. ¶ 78; *id.* ¶ 82; *id.* ¶¶ 82-83, *with id.* ¶¶ 62; 72; *id.* ¶¶ 63, 73; *id.* ¶¶ 64; 74 (similar allegations against Medterra, discussed *supra*).

As the Court described *supra*, the complaint includes another allegation against EcoNatura, which is that Plaintiff "believes that EcoNatura has capitalized upon [Plaintiff's] ideas for a CBD-based roll-on as well as a psoriasis cream by producing these items for sale to Medterra and other wholesale customers, the revenues from which are being used to solicit new investors for NoXeno, subsequent to the Defendants' exclusion of [Plaintiff] from the parties' ongoing business relationship." *Id.* ¶ 82. However, in its response to the Motion for Summary Judgment, Plaintiff does not provide any argument regarding its allegation that Plaintiff "believes" that EcoNatura has misappropriated other proprietary ideas belonging to Plaintiff. Plaintiff propounded no discovery in this case, and Plaintiff's unsubstantiated "belief" is insufficient to avoid summary judgment.

In EcoNatura's Motion for Summary Judgment, it argues that "there is no evidence that EcoNatura engaged in any sort of unfair or deceptive practice in connection with its relationship with Medterra and/or the sale of a CBD-based roll-on product or a CBD-based psoriasis cream." [Eco's MSJ at 20]. EcoNatura provided evidence in support of its position, including that Plaintiff could not prevent EcoNatura from competing with it in the CBD market following termination of the relationship between EcoNatura and Plaintiff [Genovese Tr., 287:13-24]; neither EcoNatura nor Medterra entered into a non-compete agreement with Plaintiff [J. Russano Aff. ¶ 108]; Medterra had the original idea to have EcoNatura and Plaintiff produce a CBD psoriasis cream [J.P. Larsen Decl., ¶ 11], and as a result, Genovese informed Russano that Medterra was interested in producing a CBD psoriasis cream [J. Russano Aff. ¶ 84]; and that Medterra had the original idea to have EcoNatura and Plaintiff produce a CBD roll-on product [J.P. Larsen Decl. ¶ 11], and as a result, Genovese informed EcoNatura that Medterra was interested in producing a CBD roll-on product [J. Russano Aff. ¶ 85].  [JSUF ¶¶ 79-86].

Plaintiff fails to respond to EcoNatura's argument relating to the Plaintiff's allegation in Count III regarding the CBD-based roll-on product or a CBD-based psoriasis cream.  [DE 175 ("Pl's Response") at 13-14].  In responding to EcoNatura's evidence in support of its position, Plaintiff again utterly fails to address this issue and fails to provide any evidence to support its allegation that Plaintiff "believes that EcoNatura has capitalized upon [Plaintiff's] ideas for a CBD-based roll-on as well as a psoriasis cream by producing these items for sale to Medterra and other wholesale customers[.]" Instead, Plaintiff agrees that EcoNatura could produce CBD products that might compete with Plaintiff. [Pl's SMF ¶ 79]. Then, Plaintiff objects based on relevancy and immateriality regarding EcoNatura's evidence that there is no blanket non-competition agreement binding Medterra or EcoNatura. *Id.* ¶¶ 81-81. Finally, and importantly, as

to EcoNatura's evidence directly addressing the roll-on product and the psoriasis cream, Plaintiff states that the facts are undisputed but then "objects" on the basis that "reference to the CBD psoriasis cream [and the CBD roll-on product] is irrelevant . . . and immaterial. *Id.* ¶¶ 82-82 (psoriasis cream); *id.* ¶¶ 84-85 (roll-on product). The Court easily finds that Plaintiff abandoned this allegation in Count III by failing to respond or address this issue on summary judgment. *See Palm Beach Polo, Inc.*, 19-80435-CIV, 2021 WL 2499008, at *5; *Resol. Tr. Corp.*, 43 F.3d 587, 599.

Having abandoned this allegation, Plaintiff's allegations against EcoNatura in Count III have no material distinction from its FUTSA claim against EcoNatura. Therefore, like Medterra, the Court finds that Count III against EcoNatura is preempted by FUTSA. Accordingly, summary judgment will be entered in favor of EcoNatura on Count III. *See Florida Beauty Flora Inc.*, 20-20966-CIV, 2021 WL 1945821, at *9; *see also Development Techs Developmental Techs., LLC*, No. 8:14-CV-2796-MSS-JSS, 2016 WL 7320908, at *3–4.

## C. Tortious Interference claim against EcoNatura

### 1. Allegations

In Count IV of the complaint, Plaintiff raises a claim of tortious interference with a business relationship against EcoNatura. Plaintiff alleges that EcoNatura knew of Plaintiff's preexisting business relationship with Medterra, and "[d]espite such awareness, EcoNatura proceeded to intentionally and unjustifiably interfere with the business relationship between [Plaintiff] and Medterra by forming a competing business relationship with Medterra to the exclusion of [Plaintiff] while using [Plaintiff's] proprietary CBD Cream formula as well as [Plaintiff's] concepts of a CBD-based roll-on and psoriasis cream."  [Compl. ¶¶ 86-88].

42

Plaintiff alleges that "EcoNatura divulged to Medterra, without prior authorization, [Plaintiff's] profit margin with respect to the [CBD-based Pain Cream] which caused additional damage to [Plaintiff's] relationship with Medterra." *Id.* ¶ 89.  EcoNatura "undercut the wholesale prices [Plaintiff] was quoting to Medterra once EcoNatura successfully excluded [Plaintiff] from doing further business with Medterra." *Id.*

### 2.  Elements

In order to prove a claim of tortious interference with a business relationship,  Plaintiff must establish: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference." *Volvo Aero Leasing, LLC v. VAS Aero Services, LLC*, 268 So. 3d 785, 789–90 (Fla. 4th DCA 2019), *review denied*, SC19-863, 2019 WL 6320164 (Fla. Nov. 26, 2019) (quoting *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So.2d 381, 385 (Fla. 4th DCA 1999)); *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994).

"Intent, the third element, is crucial to a claim for tortious interference; the interference must be 'direct and intentional.'" *Stanley Indus. of S. Fla., Inc. v. AIM Garments Corp.*, No. 16-62658-CIV, 2019 WL 2009336, at *3 (S.D. Fla. Mar. 15, 2019) (quoting *Rockledge Mall Associates, Ltd. v. Custom Fences of South Florida*, 779 So. 2d 554, 557 (Fla. 5th DCA 2001)). "There is no such thing as a cause of action for interference which is only negligently or consequentially effected." *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1224 (Fla. 3d DCA 1980) (citations omitted).

"Florida law recognizes the right of competitors to compete for customers." *Int'l Sales & Serv., Inc. v. Austral Insulated Products, Inc.*, 262 F.3d 1152, 1158 (11th Cir. 2001) (citing *Wackenhut Corp. v. Maimone*, 389 So.2d 656, 658 (Fla. 4th DCA 1980)). However, the privilege is not available to competitors who employ "improper means." *Id.* at 1159 (noting that the second element of the competition privilege is that the competitor "did not employ improper means"). "Whether interference with a business relationship is privileged 'depends upon a balancing of the importance ... of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances among which the methods and means used and the relation of the parties are important.'" *Id.* at 1159 (quoting *Heavener, Ogier Servs., Inc. v. R.W. Florida Region, Inc.*, 418 So.2d 1074, 1076 (Fla. 5th DCA 1982)). "When there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question." *USI Ins. Servs. LLC v. Simokonis*, No. 15-CV-24337, 2016 WL 11547701, at *15 (S.D. Fla. Apr. 15, 2016), *report and recommendation adopted,* No. 15-24337-CIV, 2016 WL 11547699 (S.D. Fla. May 13, 2016); (quoting *Mfg. Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1040 (11th Cir. 1982)).

Additionally, "Florida law recognizes the principle that actions taken to safeguard or protect one's financial interest, so long as improper means are not employed, are privileged." *Johnson Enterprises of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1321–22 (11th Cir. 1998) (citing *Ethyl Corp. v. Balter*, 386 So.2d 1220, 1225 (Fla. 3d DCA 1980); *Babson Bros. Co. v. Allison*, 337 So.2d 848, 850 (Fla. 1st DCA 1976)). Therefore, "a party's interference with another's business relationship is justified where the 'defendant is not a stranger to a business relationship [or] if the defendant has any beneficial or economic interest in, or control over, that

44

relationship.'" *Haney v. PGA Tour, Inc.*, No. 19-CIV-63108-RAR, 2020 WL 6470157, at *2 (S.D. Fla. Mar. 30, 2020) (quoting *Treco Int'l S.A. v. Kromka,* 706 F. Supp. 2d 1283, 1289 (S.D. Fla. 2010)).

### 3. *EcoNatura is not entitled to summary judgment in its favor on Count IV*

As a preliminary matter, the Court rejects Plaintiff's assertion that EcoNatura has waived its argument that it is not a stranger to the business relationship because EcoNatura should have raised it as an affirmative defense.  Rather, whether the party accused of interference is a stranger to the relationship is a threshold element of the claim. *Volvo Aero Leasing, LLC*, 268 So. 3d at 790 ("Critically to this claim [of tortious interference with a business relationship], for the interference to be unjustified, the interfering defendant must be a third party, a stranger to the business relationship.") (citation, internal quotation, and alteration omitted); *see also SIG, Inc. v. AT & T Digital Life, Inc*., 971 F. Supp. 2d 1178, 1199 (S.D. Fla. 2013) ("A tortious-interference claim cannot succeed, though, where the alleged interference is directed at a business relationship to which the defendant is a party.") (internal quotation and citation omitted); *Astro Tel, Inc. v. Verizon Fla., LLC*, 979 F. Supp. 2d 1284, 1299–300 (M.D. Fla. 2013) (holding summary judgment was warranted, in part, because plaintiff failed to demonstrate that the defendant was a stranger to the relationship at issue).  Accordingly, EcoNatura's argument that it was not a stranger to the business relationship between Plaintiff and Medterra is properly before the Court on summary judgment.[12]

---

[12] Even if pleading the stranger doctrine as an affirmative defense were required, EcoNatura's answer adequately pled the defense. EcoNatura's Tenth Affirmative Defense, as pled, was that it did not act improperly or *unjustifiably* in connection with the relationship with Medterra. [DE 15 at 19].  As already stated, "for the interference to be *unjustified*, the interfering defendant must be a third party, a stranger to the business relationship." *Volvo Aero Leasing, LLC, supra.* (emphasis added). Moreover, even if the affirmative defense was insufficient, which it is not, affirmative defenses are not waived if a plaintiff is not prejudiced where such a defense is raised for the first time at summary judgment. *See Grant v. Preferred Research, Inc*., 885 F.2d 795, 797–98 (11th Cir. 1989). Here, Plaintiff was on notice of this "stranger" to

EcoNatura presented the following evidence in support of its Motion. EcoNatura benefited financially from the relationship between these parties. [Pl's SMF & JSUF ¶ 89]. EcoNatura acknowledges that it disclosed the parties' profit margins to Medterra. [Eco's MSJ at 23; Pl's SMF ¶ 39]. EcoNatura billed Medterra directly, sending "separate invoices directly to Medterra for the outstanding purchase orders, reflecting the deposits that Medterra had already made to Plaintiff. Medterra then paid EcoNatura directly what it was owed from Plaintiff. It is these invoices that disclosed the amount Plaintiff was really making in the relationship that form the basis for Plaintiff's interference claim." [Eco's MSJ ¶ at 24; Pl's SMF & JSUF ¶ 95; Russano Aff. ¶ 103]. EcoNatura relies on the Affidavit of JP Larsen of Medterra as evidence to support that it did not terminate its relationship with Plaintiff because of the disclosure of its profit margins. *See* J.P. Larsen Decl ¶ 16. Based on this evidence, EcoNatura's position is that "this disclosure was wholly justified so that EcoNatura could receive the large amount of money it was owed and that Plaintiff was not paying. The invoices were not sent to somehow interfere with Plaintiff's relationship with Medterra, they were sent so that EcoNatura could receive payment." [Eco's MSJ ¶ at 24 (citing Russano Aff. ¶ 104)].

EcoNatura has not met its burden on summary judgment. In viewing the evidence in the light most favorable to Plaintiff, the Court finds that whether EcoNatura intentionally and unjustifiably interfered with the relationship between Plaintiff and Medterra is a determination of fact for the jury to determine. On these facts, the Court finds that whether EcoNatura was a "stranger" to the relationship between Plaintiff and Medterra is a question of fact for the jury.

---

the business relationship argument since March 22, 2021, when EcoNatura filed its original motion for summary judgment. [DE 92 at 22]. This gave ample opportunity to respond; thus, there is no unfair surprise or prejudice to Plaintiff here. *See Edwards v. Fulton County, Ga*., 509 Fed. Appx. 882, 887–88 (11th Cir. 2013) (collecting cases).

While it is true that EcoNatura profited off the relationship between Plaintiff and Medterra, EcoNatura stood to gain much more by cutting Plaintiff out of the arrangement all together. It cannot be said as a matter of law that EcoNatura did not tortiously interfere with the relationship between Plaintiff and Medterra. Therefore, summary judgment shall not be granted on Count IV and this Count shall proceed to trial as to EcoNatura.

## VI.   <u>CONCLUSION</u>

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** that Rejuvenol's Motion for Summary Judgment [DE 85] is **GRANTED**; NoXeno's Motion for Summary Judgment [DE 90] is **GRANTED;** Medterra's Motion for Summary Judgment [DE 143, DE 145] is **GRANTED**; and EcoNatura's Motion for Summary Judgment [DE 149; DE 152] is **GRANTED IN PART AND DENIED IN PART**.

The Court does find that summary judgment should be granted as to the following counts and parties: Counts I and II against Rejuvenol is granted in favor of Rejuvenol; Counts I, II, and III against NoXeno is granted in favor of NoXeno; Counts I, II, and III against Medterra is granted in favor of Medterra; Count III against EcoNatura is granted in favor of EcoNatura.  Counts I, II, and IV shall proceed to a jury trial solely against EcoNatura.  Final judgment shall be entered by separate order. All remaining issues shall be resolved at the upcoming jury trial where the trier of fact will have an opportunity to hear and consider all the relevant and probative evidence and make credibility determinations.

As to Plaintiff and the sole remaining Defendant, EcoNatura, this case is specially set for a jury trial beginning on **Wednesday, November 10, 2021, at 9:00 a.m.** before United States Magistrate Judge William Matthewman at the U.S. Courthouse located at 701 Clematis Street,

West Palm Beach, Florida.  [DE 168]. The parties and their counsel shall be ready and present for the jury trial at that time.  The parties are also reminded that a calendar call is set for **2:00 p.m. on November 3, 2021**, before the undersigned.[13]  The parties are reminded that their Exhibit List and Witness List are to be filed by **November 1, 2021** [DE 168], and the parties' proposed jury instructions and verdict forms shall be filed by **November 3, 2021** [DE 203]. In light of the Court's rulings in this Order, Plaintiff and EcoNatura **SHALL** file an amended pretrial stipulation **by or before November 2, 2021.**

Finally, the Court will address a housekeeping matter. According to the Parties' Updated Joint Status Report on Pending Motions [DE 196], the parties' have agreed that the following filings are moot and can be stricken.  Having reviewed the filings and for clarity of record, the Court agrees.  As such, the following docket entries shall be **STRICKEN** from the record:

    a.  Medterra's Motion for Summary Judgment. [DE 87];

    b.  Defendants' Joint Statement of Undisputed Material Facts [DE 88];

    c.  Econatura's Motion for Summary Judgment. [DE 92];

    d.  Affidavit in Opposition regarding Motions for Summary Judgment filed by Plaintiff [DE 101];

    e.  Plaintiff's Corrected Response to Defendants' Joint Statement of Material Facts [DE 108];

    f.  Plaintiff's Omnibus Response in Opposition regarding Motions for Summary Judgment [DE 127];

---

[13] This calendar call shall proceed via Zoom VTC. The undersigned's Courtroom Deputy, Ken Zuniga, will, at a later time, email instructions for accessing the Zoom VTC calendar call to counsel.

g.   Rejuvenol's Reply to Response to Motion for Summary Judgment [DE 130];

h.   Defendants' Joint Reply Statement of Material Facts [DE 133];

i.   Econatura's Reply in Support of its Motion for Summary Judgment [DE 134];

j.   Medterra's Reply Memorandum in Support of Motion for Summary Judgment [DE 135];

k.   Plaintiff's Response to Defendants' Joint Statement of Material Facts [DE 165];

l.   Plaintiff's Omnibus Response in Opposition to Defendants' Amended Motions for Summary Judgment [DE 166]; and

m.   Medterra's Reply Memorandum in Support of Motion for Sanctions [DE 167].

**ORDERED and ADJUDGED** in chambers at West Palm Beach, Palm Beach County, Florida, this 27th day of October 2021.

William Matthewman
United States Magistrate Judge